Opinion for the Court filed by Chief Judge SENTELLE.
Concurring opinion filed by Circuit Judge HENDERSON.
Concurring opinion filed by Circuit Judge BROWN.
SENTELLE, Chief Judge:
Appellants are researchers in the field of adult stem cells who oppose the use of federal funding for the development of embryonic stem-cell research. In district court they filed a complaint seeking declaratory and injunctive relief against appellee Secretary of Health and Human Services’ implementation of regulations allowing federal funding of such research. They appeal from a district court order entering summary judgment in favor of the defendant. Because we conclude that the district court committed no error, we affirm the order and judgment under review.
I. The Current Litigation
In August of 2009, appellants and others filed the complaint commencing this action against the Secretary of Health and Human Services and the Director of the National Institutes of Health (NIH), seeking declaratory relief that NIH Guidelines authorizing the funding of research involving human embryonic stem cells was unlawful under 5 U.S.C. § 706(2)(A). In addition to this and other declaratory relief, the complaint sought to have the court enjoin the defendants and their agencies from implementing, applying, or taking any action pursuant to the guidelines, or otherwise funding any research involving human embryonic stem cells. The district court ruled that none of the several plaintiffs had standing to bring the action and therefore dismissed it. See Sherley v. Sebelius, 686 F.Supp.2d 1 (D.D.C.2009). We reversed as to the two appellants now before the court, researchers in the field of adult stem cells, concluding that they have standing as competitors to bring these claims. Sherley v. Sebelius, 610 F.3d 69, 72-74 (D.C.Cir.2010). We remanded the case to the "district court for further proceedings. Id. at 75. On remand, the district court determined that Congress had, in an Appropriations Act rider called the Dickey-Wicker Amendment, clearly “provide[d] that no federal funds shall be used for ‘research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in útero ’ ” under other regulatory and statutory regimes. Sherley v. Sebelius, 704 F.Supp.2d 63, 70 (D.D.C. 2010) (quoting Pub.L. No. 111-8, *779 § 508(a)(2)). The district court further concluded that the guidelines under litigation violated that statutory prohibition, that the plaintiffs demonstrated a strong likelihood of success on the merits, that the plaintiffs would suffer irreparable harm in the absence of preliminary injunction, that the balance of hardships weighed in favor of preliminary injunction, and that public interest weighed in favor of the issuance of a preliminary injunction. The court therefore entered the preliminary injunction sought by plaintiffs. Defendants appealed.
On appeal, we determined that NIH had reasonably interpreted the Dickey-Wicker Amendment and vacated the preliminary injunction entered by the district court. Sherley v. Sebelius, 644 F.3d 388, 390 (D.C.Cir.2011). After the second remand, the district court entered the summary judgment in favor of defendant now under review.
II. Background
The relevant facts are set forth in our opinion reviewing the preliminary injunction, see Sherley, 644 F.3d at 389-92, and in the two opinions of the district court, so we shall review them but briefly. Beginning in 1996, Congress has regularly included in appropriation bills a rider called the Dickey-Wicker Amendment, see, e.g., Consolidated Appropriations Act, 2012, Pub.L. No. 112-74, § 508. The Dickey-Wicker Amendment prohibits NIH from funding “(1) the creation of a human embryo or embryos for research purposes; or (2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in útero under 45 C.F.R. 46.204(b) and [42 U.S.C. § 289g(b) ].” Id.
At the time of the adoption of the first Dickey-Wicker rider, scientists had not yet isolated embryonic stem cells (BSC), and the original enactment was apparently directed at another type of research performed on human embryos in the field of in vitro fertilization. Sherley, 644 F.3d at 390. By 1998, researchers had generated a stable line of ESCs available for further research. Although more mature stem cells were and remain available, many researchers consider the ESCs far more valuable because they are pluripotent— that is, they can be developed into any of nearly 200 different types of human cells for use in a broad range of medical research.
Isolating ESCs for research requires that the cells be removed from a human embryo, cultured, and stabilized into a “stem cell line.” This process of “derivation” destroys the embryo. The cells from this line may then be used for years by researchers, who differentiate the cells into whatever kinds of cells they need for a particular research project. Thus, the initial derivation process requires the destruction of a human embryo. The particular research projects using the earlier derived stem cells, however, does not involve the destruction of any further embryos.
It is this distinction between funding research projects directly involving the destruction of a human embryo and projects using embryonic stem cells derived from an earlier destruction that underlies the controversy giving rise to the present litigation. In 2001, President George W. Bush, for ethical reasons, declared that federal funds would be used in research on embryonic stem cells only if such cells were drawn from one of the sixty or so stem cell lines already existing at the time of President Bush’s declaration. Address to the Nation on Stem Cell Research from Crawford, Texas, 37 Weekly Comp. Pres. Doc. 1149, 1151 (Aug. 9, 2001). President Bush later formalized this policy in an *780 Executive Order. Exec. Order No. 13,435, 72 Fed.Reg. 34,591 (June 20, 2007).
So matters stood until 2009, when President Obama issued an Executive Order revoking Executive Order No. 13,433. Exec. Order No. 13,505, 74 Fed.Reg. 10,-667 (Mar. 11, 2009). The Order stated that NIH “may support and conduct responsible, scientifically worthy human stem cell research, including human embryonic stem cell research, to the extent permitted by law.” Id.
As required by the Executive Order and after notice and comment, NIH issued new “Guidelines for Human Stem Cell Research,” 74 Fed.Reg. 32,170 (July 7, 2009) (Guidelines). The Guidelines “recognize the distinction, accepted by Congress, between the derivation of stem cells from an embryo that results in the embryo’s destruction, for which Federal funding is prohibited, and research involving [ESCs] that does not involve an embryo nor result in an embryo’s destruction, for which Federal funding is permitted.” Id. at 32,173. Under the Guidelines, an ESC research project may receive NIH funding as long as it utilizes cells from lines (1) created by in vitro fertilization for reproductive purposes, (2) no longer needed for that purpose, and (3) voluntarily donated by the individuals who owned them — even if that line was derived after 2001. Id. at 32,174.
During the notice and comment proceedings, the current appellants filed comments opposing the use of federal funds for any embryonic stem-cell research. NIH did not respond to their comments. After the adoption of the guidelines, appellants brought the present action.
III. Analysis
We note at the outset that our review of the district court’s grant of summary judgment in favor of the government is de novo. See, e.g., Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C.Cir.2011). Therefore, our duty is to undertake the same examination as did the district court. On summary judgment review in general, that requires the court to grant summary judgment in favor of the moving party if that party “shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56. In this court, as in the district court, the APA governs the scope of administrative reviews such as the one before us. That Act requires a reviewing court to “hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). Thus, we, as did the district court, must allow summary judgment for appellees, unless appellants have produced in the record at least enough support for their position to establish “a genuine dispute” as to some material fact from which we could discern that the adoption or implementation of the guidelines by the appellees was “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” There is no serious dispute of fact in this case. Appellants advance three arguments for invalidating the NIH guidelines, each of which relies upon a proposition of law.
1. Dickey-Wicker
Appellants’ first and principal argument is that the NIH guidelines violate the Dickey-Wicker ban on federal funding of “research in which a human embryo or embryos are destroyed.” On this issue, the law of the case is established against them.
The purpose of the law-of-the-case doctrine is to ensure that “the same issue presented a second time in the same case in the same court should lead to the same result.” LaShawn A. v. Barry, 87 F.3d *781 1389, 1393 (D.C.Cir.1996). The courts are appropriately “ ‘loathe’ to reconsider issues already decided,” except in the case of “extraordinary circumstances such as where the initial decision was ‘clearly erroneous and would work a manifest injustice.’ ” Id. (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983))). Appellants’ argument before us in the preliminary-injunction review was the same as now. Specifically, they asserted then and assert now that the Dickey-Wicker ban “unambiguously” extends to any research project that uses ESCs. Sherley, 644 F.3d at 395. Then-argument, now and before, is that if a funded research project involves the use of an ESC, then an embryo necessarily has been destroyed, and the ban of Dickey-Wicker has been violated. See generally id. at 393-94. Briefly put, appellants contend that all ESC research is “research” in which a human embryo or embryos are destroyed and, therefore, NIH’s guidelines violate Dickey-Wicker by authorizing federal funding of such research. This is precisely the same argument we rejected in our review of the preliminary injunction order.
Applying Chevron analysis, see Chevron U.S.A, Inc. v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we held that NIH had reasonably interpreted Dickey-Wicker’s ban on funding “research in which ... embryos are destroyed” to allow federal funding of ESC research. Sherley, 644 F.3d at 393-96. We explained that “research” as used in Dickey-Wicker was a “flexible” (i.e., ambiguous) term. Id. at 394. It could be understood as the plaintiffs construed the term — an “extended process” that would include the initial derivation of stem cells. Or “research” could take on NIH’s narrow interpretation as a “discrete project” separate from derivation. Id. Given that ambiguity, we deferred under Chevron to NIH’s permissible construction of Dickey-Wicker: “research” as used in Dickey-Wicker may reasonably be understood to mean a “discrete endeavor” that excludes the initial derivation of ESCs. Id. at 396 n. *. Under that interpretation, Dickey-Wicker permits federal funding of research projects that utilize already-derived ESCs — which are not themselves embryos — because no “human embryo or embryos are destroyed” in such projects. Id. at 393-96 (emphasis added). Plaintiffs’ argument on this theory for relief is no different than it was in our prior review. Therefore, unless they have established some “extraordinary circumstance,” La-Shawn A., 87 F.3d at 1393, the law of the case is established and we will not revisit the issue.
Appellants have offered an exception to the law-of-the-case doctrine which they argue should permit us to revisit the issue. As they point out, we have held that “the decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute law of the case for the purpose of further proceedings and does not limit or preclude the parties from litigating the merits.” Berrigan v. Sigler, 499 F.2d 514, 518 (D.C.Cir.1974); see also Belbacha v. Bush, 520 F.3d 452, 458 (D.C.Cir.2008). Therefore, appellants reason, we are not bound by our prior determination in the review of the grant of preliminary injunction. However, on the facts of this case, the exception to the law-of-the-case doctrine is inapplicable.
The generally recognized precedent for the preliminary injunction exception to the law-of-the-case doctrine arises from the nature of a preliminary injunction. That equitable remedy is a stopgap measure, generally limited as to time, and intended to maintain a status quo or “to preserve *782 the relative positions of the parties until a trial on the merits can be held.” Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). In trial court, this would mean that a determination had been made without discovery or the other full range of exploratory and preparatory pretrial procedures and without a full trial on the merits. In appellate review, the court of appeals must often consider such preliminary relief without the benefit of a fully developed record and often on briefing and argument abbreviated or eliminated by time considerations. See, e.g., Cohen v. Brown Univ., 101 F.3d 155, 169 (1st Cir.1996). Thus arose the exception to the law-of-the-case doctrine. An appellate court in a later phase of the litigation with a fully developed record, full briefing and argument, and fully developed consideration of the issue need not bind itself to the time-pressured decision it earlier made on a less adequate record.
Furthermore, independent of the preliminary-injunction exception, a decision in the preliminary-injunction context may fail to garner law-of-the-case effect simply because it fails to satisfy an element of the law-of-the-case rule itself: the requirement that a court must “affirmatively decide[ ]” an issue, explicitly or by necessary implication, to establish law of the case. Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C.Cir.1995). The standard for granting a preliminary injunction essentially asks — in part — whether a plaintiff is “likely to succeed on the merits” of his claim. See, e.g., Winter v. NRDC, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). To the extent an appellate court predicts, without making a definitive legal conclusion, that the plaintiffs probably or likely will or will not succeed on the merits, it cannot be said that the court “affirmatively decided” the issue such that it would bind an appellate court at a later stage of the litigation.
The question raised by this appeal is whether we should apply the preliminary-injunction exception to the law-of-the-case preclusion where the reasons for its application are absent. That is, where the earlier ruling, though on preliminary-injunction review, was established in a definitive, fully considered legal decision based on a fully developed factual record and a decisionmaking process that included full briefing and argument without unusual time constraints, why should we not follow the usual law-of-the-case jurisprudence? While we have not previously provided a definitive answer to that question, several other circuits and commentators have.
For example, in Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17 (1st Cir.2008), the First Circuit considered an appeal from summary judgment upholding a city ordinance against a First Amendment challenge. The circuit had previously affirmed the denial of preliminary injunction in the same case. In holding that the law-of-the-case doctrine applied, even though the first decision was in the denial of a preliminary injunction and the second appeal was from the entry of summary judgment, that circuit noted that “the doctrine applies when [the] court has previously ruled on a motion for preliminary injunction and ‘the record before the prior panel was sufficiently developed and the facts necessary to shape the prior legal matrix were sufficiently clear.’ ” Id. at 20 (quoting Cohen v. Brown Univ., 101 F.3d 155, 169 (1st Cir.1996) (other citations, quotation marks, and alterations omitted)).
In This That and The Other Gift and Tobacco, Inc. v. Cobb County, 439 F.3d 1275, 1284-85 (11th Cir.2006), the Eleventh Circuit reached a similar decision, citing its own precedent to the effect that prior clear legal conclusions reached at the preliminary injunction stage would be afforded law-of-the-case status. In Enter *783 gy, Arkansas, Inc. v. Nebraska, 241 F.3d 979, 987 (8th Cir.2001), the Eighth Circuit afforded law-of-the-case status to an Eleventh Amendment issue “carefully considered” in deciding the course of the preliminary injunction appeal. And in Royal Insurance Co. of America v. Quinn-L Capital Corp., 3 F.3d 877, 880-81 (5th Cir.1993), the Fifth Circuit ruled to the same effect. One of the leading commentators on federal jurisprudence has stated, “A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal, however, does become the law of the ease for further proceedings in the trial court on remand and in any subsequent appeal.” 18B Charles A. Wright et al., Fed. Prac. & Proc. Juris. § 4478.5 (2d ed.).
Appellants insist application of the preliminary injunction exception is mandated by circuit precedent. For this proposition, they rely on Berrigan and Belbacha. They note that in Berrigan, we stated, “The decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits, unless there has been an order of consolidation pursuant to Rule 65(a)(2), not the case here.” 499 F.2d at 518. In Belbacha, we stated, “An order denying preliminary relief, however, ‘does not constitute the law of the case,’ although it can be ‘persuasive.’ ” 520 F.3d at 458 (quoting Berrigan). No doubt these cases state the generally applicable rule for preliminary-injunction decisions. However, the case before us is factually distinguishable. The time constraints and limited record available to the court in those cases are not present here. We therefore follow the other circuits in concluding that the exception is not present either. Appellants’ first argument fails.
2. Subjected to Risk
Appellants make a second argument that is intertwined with their first. They note that Dickey-Wicker also bans “research in which a human embryo or embryos are ... knowingly subjected to risk of injury or death.” § 508(a)(2). Even if the NIH guidelines do not violate the Dickey-Wicker ban on funding “research in which a human embryo or embryos are destroyed” (because law of the ease accorded Chevron deference to NIH’s interpretation), appellants maintain that the guidelines still run afoul of the “subjected to risk” language. They theorize that conducting a federally funded ESC research project increases the demand for more ESC lines, which in turn incentivizes the destruction of more embryos to create those lines, thus subjecting those embryos to risk. NIH responds that no embryos are subjected to risk of injury or death in any ESC research project using already derived ESCs and not otherwise involving the use of embryos.
Although appellants can credibly argue that this precise question of statutory interpretation is not within the law of the case, our result is nonetheless controlled by that doctrine. Law of the case has established that Chevron deference applies. It is established that “research” as used in Dickey-Wicker is an ambiguous term, and that NIH’s interpretation of the term “research” as a discrete project rather than an extended process is reasonable. Under that definition of “research,” the destruction of embryos that occurs in the ESC derivation process is not a part of individual ESC research projects using already derived ESCs. Therefore, ESC research is no more “research in which ... embryos are ... subjected to risk” than it was “research in which ... embryos are ... destroyed.” Appellants’ theory shifts focus from the embryo destroyed in the *784 past to embryos for which an ESC research project “incentivizes” future destruction. But none of those embryos are “destroyed” or “subjected to risk” in an ESC research project. The language of Dickey-Wicker does not ban funding for, e.g., “research which provides an incentive to harm, destroy, or place at risk human embryos.” As we have held before, the NIH interpretation of the statute’s actual language is reasonable.
3. Failure to Reply to Comments
The plaintiffs finally contend that NIH violated the APA by issuing the Guidelines without addressing comments categorically objecting to ESC research, which the plaintiffs consider relevant to NIH’s decision to expand the availability of ESC research funding. While this contention remains unfettered by decisions made in Sherley II, it fares no better than the Dickey-Wicker arguments.
APA Section 553 requires agencies to provide the public with notice of a proposed rulemaking, an opportunity to comment, and, “[ajfter consideration of the relevant matter presented,” a “concise general statement” of the rule’s basis and purpose. 5 U.S.C. § 553. We have said before that “the opportunity to comment is meaningless unless the agency responds to significant points raised by the public.” Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 (D.C.Cir.1977). That said, an agency’s failure to address a particular comment or category of comments is not an APA violation per se. See, e.g., Thompson v. Clark, 741 F.2d 401, 408 (D.C.Cir.1984) (“[APA § 553] has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial”). We review an agency’s response to comments under the same arbitrary-and-capricious standard to which we hold the rest of its actions. See Home Box Office, 567 F.2d at 35 n. 58. Put simply, “The failure to respond to comments is significant only insofar as it demonstrates that the agency’s decision was not based on a consideration of the relevant factors.” Covad Commc’ns v. FCC, 450 F.3d 528, 550 (D.C.Cir.2006) (quoting Thompson, 741 F.2d at 409).
The comments identified by appellants cited scientific and ethical problems with ESC research and categorically objected to funding any ESC research at all. They advocated funding other types of stem-cell research instead. Crucially, however, this recommended course of action is diametrically opposed to the direction of Executive Order 13,505, which NIH sought to “implement” by issuing the Guidelines, see 74 Fed.Reg. at 32,170. That Order makes it quite plain that its dominant purpose was to “remove” President Bush’s 2001 “limitations” on funding human ESC research and to “expand” NIH support for human stem-cell research, “including human embryonic stem cell research.” See 74 Fed.Reg. at 10,667, §§ 1-2 (titled “Removing Barriers to Responsible Scientific Research Involving Human Stem Cells”). Yet the comments at issue advocate ending all ESC research funding — even for research that has been eligible for funding for a decade under the 2001 restrictions. Following these commenters’ lead would directly oppose the clear import of the Executive Order, which sought to remove limitations on ESC research and to expand NIH support for stem-cell research.
NIH may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President’s policy directives to the extent permitted by law. See Bldg. & Const. Trades Dept. v. Allbaugh, 295 F.3d 28, 32-33 (D.C.Cir. 2002) (citing The Federalist No. 72, at 463 *785 (Alexander Hamilton) (Benjamin F. Wright ed., 1961)). Bound as it is to carryout the President’s directives, NIH thus reasonably limited the scope of its Guidelines to implement the Executive Order. And because the Executive Order’s entire thrust was aimed at expanding support of stem-cell research, it was not arbitrary or capricious for NIH to disregard comments that instead called for termination of all ESC research (including research that the executive branch has permitted since 2001). Such comments simply did not address any factor relevant to implementing the Executive Order.
While the district court also rejected the plaintiffs’ APA claim, it did so by relying in part on its holding that NIH’s interpretation of the Executive Order deserved deference under Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The plaintiffs claim that such deference is unwarranted for a variety of reasons. We have no reason to resolve this argument here. We need not rely on deference to NIH’s interpretation of Executive Order 13,505 to conclude that NIH’s choice to disregard the comments at issue was not arbitrary or capricious. NIH stated that the scope of its Guidelines was to “implement Executive Order 13505,” 74 Fed.Reg. at 32,174, and that Order plainly starts from the premise that NIH should continue to fund at least some ESC research. NIH’s decision to dismiss comments seeking to reopen that premise for debate therefore did not demonstrate a failure to consider relevant factors.
Conclusion
For the above reasons, we affirm the district court’s grant of summary judgment in favor of the government.

So ordered.