# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 8, 2022          Decided August 9, 2022

No. 21-5045

DAMIEN GUEDES, ET AL.,
APPELLANTS

FIREARMS POLICY COALITION, INC.,
APPELLEE

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,
ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02988)

———

*Erik S. Jaffe* argued the cause for appellants. With him on the briefs were *Joshua G. Prince, Adam Kraut,* and *Joshua J. Prince.*

*John Cutonilli*, pro se, was on the brief for *amicus curiae* John Cutonilli in support of appellants.

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, and *Michael S. Raab, Abby C. Wright, Brad Hinshelwood,* and *Kyle T. Edwards,* Attorneys.

*Ian Simmons, Jonathan Lowy,* and *Eric Tirschwell* were on the brief for *amici curiae* Giffords Law Center to Prevent Gun Violence, and Brady and Everytown for Gun Safety in support of appellees.

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Is a bump stock device a "machine gun" within the meaning of federal law? We are tasked with answering that question definitively. Following the 2017 mass shooting in Las Vegas in which 58 people were killed and approximately 500 were wounded—the deadliest in modern American history—the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or the "Bureau") promulgated a rule classifying "bump stocks" as machine guns.[1] A bump stock, like those used by the Las Vegas shooter, replaces a rifle's stationary stock with a sliding stock. It thereby enables the weapon to slide back and forth against the shooter's shoulder, "bumping" the shooter's trigger finger repeatedly and rapidly firing the weapon. The Bureau's new rule instructed individuals with bump stocks to either destroy

---

[1] We follow the previous panel's example and use the two-word spelling of "machine gun" except when directly quoting sources. *Guedes v. ATF*, 920 F.3d 1, 6 n.1 (D.C. Cir. 2019).

them, abandon them at the nearest ATF facility, or face criminal penalties.

The Bureau interpreted "machine gun," as defined in the National Firearms Act and Gun Control Act, to extend to bump stocks. Plaintiffs initially moved for a preliminary injunction to stop the rule from taking effect, which the District Court denied, and a panel of this Court affirmed. At the merits stage, the District Court again rejected Plaintiffs' challenges to the rule under the *Chevron* framework. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The central question on appeal is whether the Bureau had the statutory authority to interpret "machine gun" to include bump stocks. Employing the traditional tools of statutory interpretation, we find that the disputed rule is consistent with the best interpretation of "machine gun" under the governing statutes. We therefore affirm.

I.

A.

Congress enacted the National Firearms Act in 1934 to regulate the sale of particular firearms, including machine guns. Initially, the Act defined a "machine gun" as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." Pub. L. No. 73-474, § 1(b), 48 Stat. 1236, 1236 (1934). In 1968, Congress removed "or semiautomatically" and expanded the definition to include:

> the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any

combination of parts from which a machinegun can be assembled.

Pub. L. 90-618, 82 Stat. 1213, 1231 (1968). Congress charged the Attorney General with enforcement of the National Firearms Act, who in turn delegated enforcement authority to the Bureau. 26 U.S.C. § 7801(a); 28 C.F.R. § 0.130(a).

With the Gun Control Act of 1968, Congress incorporated the National Firearms Act's definition of "machinegun" and strengthened its prohibitions on firearm sales and licensing. 18 U.S.C. § 922(a)(4). As amended by the Firearm Owners' Protection Act of 1986, the Gun Control Act prohibits the transfer of or possession of machine guns, excluding those authorized to possess such weapons by the state or federal government or those who possessed them before the law took effect. 18 U.S.C. § 922(o). The Gun Control Act's enforcement scheme is identical to that of the National Firearms Act. Congress empowered the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter," who delegated this authority, in turn, to the Bureau. *Id.* § 926(a); 28 C.F.R. § 0.130(a)(6).

In 2006, the Bureau determined that certain bump stock devices—ones that harnessed energy from an internal spring's recoil, like an Akins Accelerator—qualified as machine guns under both Acts. *See* ATF Rul. 2006-2. Between 2008 and 2017, however, the Bureau issued ten letter rulings in which it concluded that devices relying on both the recoil energy and the shooter's constant forward pressure were not machine guns. These weapons fired multiple shots with a "single pull of the trigger," but in the Bureau's view did not operate

"automatically," though the Bureau did not engage with the meaning of the term. *Id.* at 66,518.[2]

In the aftermath of the Las Vegas shooting, then-President Trump and Congress urged the Bureau to revisit its position on bump stocks. *Department of Justice Announces Bump-Stock-Type Devices Final Rule*, DEP'T OF JUST. (Dec. 18, 2018), https://www.justice.gov/opa/pr/department-justice-announces-bump-stock-typedevices-final-rule, J.A. 21–22. Following a notice of proposed rulemaking, *see Bump-Stock-Type Devices*, 83 Fed. Reg. 13,442 (Mar. 29, 2018), the Bureau issued a final rule reversing its earlier position that only bump stocks with internal springs qualified as machine guns under the National Firearms Act and Gun Control Act. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,514–15 (Dec. 26, 2018) ("Bump Stock Rule" or "Rule"). Under the Rule, "bump-stock-type devices are 'machineguns' as defined by the National Firearms Act and Gun Control Act because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger." *Id.* at 66,515. These devices, whether operated by an internal spring or manual pressure, "convert an otherwise semiautomatic firearm into a machinegun." *Id.*

The Rule defined "single function of the trigger" as a "'single pull of the trigger' and analogous motions" and "automatically" as "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* Individuals currently in possession of bump stocks were directed to either destroy them

---

[2] These devices included one from the manufacturer of at least one of the bump stock devices used in the Las Vegas shooting. *Id.* at 66,516.

or abandon them at an ATF facility prior to the rule taking effect on March 26, 2019.  *Id.* at 66,514, 66,515.

B.

In December 2018, pursuant to the Bureau's notice of final rulemaking, Plaintiffs sought a preliminary injunction to prevent the rule from taking effect.  The District Court denied that request, finding the Bureau's interpretation of the relevant statutory terms—"single function of the trigger" and "automatically"—reasonable under *Chevron*.  *Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) ("*Guedes I*").

We affirmed the District Court's decision on the same basis.  *Guedes v. ATF*, 920 F.3d 1, 6 (D.C. Cir. 2019) (per curiam) ("*Guedes II*").  In our view, the *Chevron* framework applied, notwithstanding Plaintiffs' objections, because the rule was legislative in character; the government could not waive *Chevron* deference; and *Chevron* applies in equal force to provisions with criminal penalties.  *Id.* at 17–28.  Because we found "single function of the trigger" and "automatically" ambiguous under the National Firearms Act and Gun Control Act and the agency's interpretations reasonable, we ruled in the Bureau's favor.

The Supreme Court denied Plaintiffs' petition for certiorari.  *Guedes v. ATF*, 140 S. Ct. 789 (2020) (Mem.).  In a separate statement, Justice Gorsuch articulated his view that *Chevron* did not apply because of the government's express waiver of the doctrine and the statute's criminal penalties.  *Id.* at 790.  He nevertheless concurred in the petition's denial, finding that the government's position could be substantiated at the merits stage and noting that other courts of appeals were currently considering challenges to the Rule.  *Id.* at 791.

Now before us is the District Court's grant of the government's motion for summary judgment and denial of Plaintiffs' cross-motion for summary judgment. *Guedes v. ATF*, 520 F. Supp. 3d 51, 58 (D.D.C. 2021) ("*Guedes III*"). For the same reasons discussed in *Guedes I* and *II*, the District Court found the Bureau reasonably construed the statute under *Chevron* and rejected Plaintiffs' challenges on the merits. *Id.* at 65.

## II.

We have jurisdiction over this appeal under 28 U.S.C. § 1291, and we review a grant or dismissal of a motion for summary judgment de novo. *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 944 (D.C. Cir. 2017).

## III.

### A.

The government urges us to decide this appeal based on the law of the case doctrine, which instructs that "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996). The doctrine is a discretionary prudential doctrine, not a jurisdictional bar, and we decline to apply it here. *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739–40 (D.C. Cir. 1995). This is not a situation in which we are reaching a different result on the same legal issue in the same case, which could require showing "extraordinary circumstances." *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012) (quoting *LaShawn A.*, 87 F.3d at 1393). Rather, we ultimately reach the "*same result*" as the *Guedes II* panel, *id.*, in that we likewise sustain the Bump Stock Rule.

If we were reaching a different result, we would assess our discretionary decision to do so under "the preliminary injunction exception to the law-of-the-case doctrine." *Sherley*, 689 F.3d at 781. We need not fit within that exception, though, in circumstances in which we reach the same result. To be sure, we reach that result via a different path. But we are unaware of any decision saying that the pursuit of a different path—as opposed to the reaching of a different result—requires fitting within an exception to the law-of-the-case doctrine or a showing of extraordinary circumstances, especially when we have no need here to revisit the reasoning of the *Guedes II* panel. And we explain next why we opt to sustain the validity of the Bump Stock Rule in a different way than did that panel.

B.

The threshold question is whether to treat this case as a matter of pure statutory interpretation or to apply the *Chevron* framework. Both parties advocate for the former. Plaintiffs argue that *Chevron* does not apply for a multitude of reasons: the rule is interpretive in nature; the government waived *Chevron* deference; the Court may not apply *Chevron* to a statute with criminal penalties; and the rule of lenity must supersede *Chevron* in the criminal context. The Bureau also characterizes the Rule as interpretive, and it likewise urges us to analyze the Rule under a statutory interpretation framework.

The *Guedes II* panel employed the *Chevron* framework— just as the District Court had done—in denying the motion for preliminary injunction. The panel concluded that the Bump Stock Rule was a legislative rule; the Bureau explicitly relied on *Chevron* in crafting it; the government cannot recharacterize a rule as legislative or interpretative during litigation; and the government cannot waive *Chevron*. 920 F.3d at 18, 21–23.

Ultimately, we need not wrestle with the *Chevron* framework here. Rather, the parties have asked us to dispense with the *Chevron* framework, and in this circumstance, we think it is appropriate to do so. *See Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022) (rejecting agency's interpretation "after employing traditional tools of statutory interpretation," rather than inquiring into the interpretation's reasonableness under *Chevron*). Using a statutory interpretation lens, we decide that the Bureau offered the best construction of the statute without wading into the subsidiary questions that the *Chevron* analysis poses.

This approach also comports with how the Bureau engaged in the rulemaking exercise. The Bureau repeatedly described what it was doing as seeking to arrive at the "best interpretation" of the statutory text, and it relied principally on that reasoning during the rulemaking. *Bump Stock Rule*, 83 Fed. Reg. at 66,514, 66,517, 66,518, 66,521. This is also the Bureau's principal position on appeal. Appellee Br. 28. While the Bureau contended that it would reach the same result using a *Chevron* framework, that argument served as its fallback position. 83 Fed. Reg. at 66,527 (explaining that "this rule's interpretations of 'automatically' and 'single function of the trigger' in the statutory definition of 'machinegun' accord with the plain meaning of those terms," but that "even if those terms are ambiguous, this rule rests on a reasonable construction of them"). This jurisprudential approach thus allows us to address the issues as the parties have principally framed them for resolution. If we are able to uphold the Bureau's definition based on its primary line of argument, there is no reason to reach its secondary one. *See HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021) (declining to consider whether *Chevron* deference was due where government did not invoke it).

Finally, there is no need to decide what deference, if any, a regulation should receive where we can conclude that the agency's interpretation of the statute is the best one. Our decision to forgo engaging with questions of *Chevron*'s applicability is consistent with how courts have approached agency interpretation issues in the past. As the Supreme Court explained in *Edelman v. Lynchburg College*, "there is no need to resolve any question of deference," where the agency regulation is "not only a reasonable one, but the position we would adopt even if there was no formal rule and we were interpreting the statute from scratch." 535 U.S. 106, 114 (2002). That is not to say that the agency's rule must be the only "permissible" interpretation of the statute, but only that it must be the best construction. *Id.* at 114 & n.8. *See also Washington Reg'l Medicorp v. Burwell*, 813 F.3d 357, 362 (D.C. Cir. 2015) (finding no need to engage in deference analysis where agency's interpretation is both reasonable and the best interpretation of the statute); *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. at 1896 (employing "traditional tools of statutory interpretation" to analyze an agency rule, without resort to *Chevron* or any other form of deference to the agency); *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2368 (2022) (same).

So too here, in relying on the ordinary tools of statutory interpretation—"text, structure, purpose, and legislative history," *see Pharm. Rsch. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)—we find that the Bureau has provided the best reading of the statute and that the statutory definition of machine gun as articulated in 26 U.S.C. § 5845(b) extends to bump stocks.

11

(i)

Recall the National Firearms Act and Gun Control Act's definition of "machinegun":

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). Whether this definition encompasses bump stocks depends on how we interpret two of its interior phrases—"single function of the trigger" and "automatically"—and how those phrases relate to one another.

Starting with "single function of the trigger," the Bureau interprets it as a "'single pull of the trigger' and analogous motions." *Bump Stock Rule*, 83 Fed. Reg. at 66,515. The phrase "analogous motions" includes "other methods of initiating an automatic firing sequence that do not require a pull," like a push of a button or voice command. 83 Fed. Reg. at 66,515, 66,534–35. The Bureau's interpretation of "single function of the trigger" thus both defines a "function" of the trigger as a "pull" of the trigger and clarifies that a "pull" of the trigger is a shooter's volitional action that initiates an automatic firing sequence.

The Bureau offers the best reading of the statutory phrase in light of the plain language and purpose of the statute,

particularly as compared to Plaintiffs' unworkable definition. To begin, the Bureau recognized that it was not interpreting "single function of the trigger" on a blank slate. In *Staples v. United States*, the Supreme Court referred to an "automatic" or "fully automatic" weapon under the National Firearms Act as one "that fires repeatedly with a *single pull* of the trigger," in contrast to one "that fires only one shot with each pull of the trigger." 511 U.S. 600, 602 n.1 (1994) (emphasis added). Further, in *Akins v. United States*, 312 Fed. App'x 197, 200 (11th Cir. 2009) (per curiam), the Eleventh Circuit found the Bureau's interpretation of "single function" as a "single pull of the trigger" to be consistent "with the statute and its legislative history." The Bureau explicitly drew upon both interpretations in crafting its own. *See Bump Stock Rule*, 83 Fed. Reg. at 66,518, 66,527 (quoting *Staples*, 511 U.S. at 602 n.1; *Akins*, 312 Fed. App'x at 200). *See also United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (using "pull" and "function" synonymously in classifying weapon as a machine gun).

Such an interpretation is also consonant with the ordinary meaning of "function" at the time of the statute's enactment. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.").[3] In 1934, "function" was defined as

---

[3] Plaintiffs rely on the 1968 dictionary definitions of these terms, arguing that Congress "narrowed" the definition of machine gun that year in enacting the Gun Control Act. Appellants' Opening Br. 23, 27. But "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 874–75 (1999) (internal quotation marks and citation omitted). *See also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 78 (2012) ("Words must be given the meaning they had when the text was

"to perform, execute" or an "activity; doing; performance." *Function*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934). With respect to the statute, the shooter's pull is the single "activity" or "performance" of the trigger that causes the gun to shoot automatically more than one shot. (Where a different activity causes the trigger to shoot, like the flip of a switch, the regulation accounts for it through the inclusion of "and analogous motions.").

Indeed, as early as Congress began discussing restrictions on machine guns through the National Firearms Act, a "single function of the trigger" was understood to mean a "single pull." Congress initially proposed a definition of "machine gun" based on a weapon's capability to fire multiple shots, specifically a firearm that could automatically or semiautomatically shoot "twelve or more shots without reloading." *See National Firearms Act: Hearings Before the Comm. on Ways and Means, H.R., on H.R. 9066*, 73d Cong. 1 (1934). Testifying before Congress, President of the National Rifle Association Karl T. Frederick advocated for an alternative definition that omitted the number of shots required and incorporated the "single function of the trigger" language. *Id.* at 40. Mr. Frederick further explained that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine." *Id.*[4] Roughly one

---

adopted."). Given that Congress enacted the National Firearms Act in 1934, we look to dictionary definitions at that time.

[4] Frederick also testified that an automatic Colt pistol would not be a machine gun under his proposed definition because it "require[d] a separate pull of the trigger for every shot fired." *Id.* at 41. (The name of this weapon is deceptive, given that the ATF classified an automatic Colt Pistol as a semiautomatic firearm. *See* ATF, NEWS MEDIA GUIDE TO FIREARMS 5–6 (1978)). Frederick's testimony on

month later, Congress adopted Frederick's definition word for word. *Id.* at 83. *See also* H.R. Rep. No. 73-1780, at 2 (1934) (noting the bill's "usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger"). Reading "single function" to mean a "single pull" thus reflects the term's contemporaneous understanding.

This definition also aligns with Congress's purpose in enacting federal legislation on machine guns to "[s]trictly regulate the manufacture, sale, transfer and possession of destructive devices" and to "combat the spiralling increase in serious crime in the United States." S. Rep. No. 90-1097, at 2,290 (1968); *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("principal purpose" of the Gun Control Act was to reduce crime) (quoting *id.* at 2,113–14). Congress's concern for the danger posed by machine guns centered on their destructive potential and exacerbation of serious crime. Bump stocks present a heightened capacity for lethality as well; they are estimated to fire between 400 and 800 bullets per minute, as compared to a semiautomatic weapon's 180 bullets per minute. Amicus Br. for Appellee at 19–20. It is therefore consistent with congressional purpose to define "single function" with a focus on the weapon's ease of use.

Turning to "automatically," the statutory text similarly favors the Bureau's definition. The Bureau defines "automatically" as "the result of a self-acting or self-regulating mechanism that allows the firings of multiple rounds." *Bump Stock Rule*, 83 Fed. Reg. at 66,554. This definition pulls

---

this score supports the Bureau's interpretation that an automatic gun requires a single pull to set off a sequence of multiple shots, whereas a semiautomatic gun requires a distinct pull for each shot. Appellee Br. 47–48.

directly from dictionaries of the 1930s, which defined "automatic" as "having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation;—said esp. of machinery or devices which perform work formerly or usually done by hand." *Bump Stock Rule*, 83 Fed. Reg. at 66,519; *Automatic*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934). The term speaks of a mechanized process that requires less human exertion than an activity "usually done by hand."

The Bureau's prior interpretation of "automatically" focused more on the "self-acting" portion of the definition. 83 Fed. Reg. at 66,517–18. It previously concluded that a device must contain a spring or similar self-acting mechanism in order to operate "automatically"—therefore, bump stocks did not operate "automatically" because they required some manual input. *Id.* In the current rulemaking, the Bureau correctly recognized not only that "self-acting" can admit of some human input, but also that the word "automatically" encompasses devices that are "self-regulating." *Id.* at 66,519.

This definition has found approval in past judicial interpretations. In *United States v. Olofson*, the Seventh Circuit concluded that under the National Firearms Act, "the adverb 'automatically' . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism. That mechanism is one that is set in motion by a single function of the trigger and is accomplished without manual reloading." 563 F.3d 652, 658 (7th Cir. 2009).

Statutory context also helps guide our interpretation here, given that "automatic" cannot be read in isolation. The statute defines a machine gun as a weapon that shoots "automatically more than one shot, without manual reloading, *by* a single function of the trigger." 26 U.S.C. § 5845(b) (emphasis

added). Equally important is the term "by," defined as "through the means of; in consequence of;—indicating that which is instrumental; as, to take *by* force; to win regard *by* showing kindness; to teach *by* example." *By*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934). As used in the statute, a machine gun is a weapon that automatically shoots more than one shot "through the means of" or "in consequence of" a single function of the trigger.

Rather than limiting the term "automatically," the phrase "by a single function" clarifies it. With the use of "by," "single function" is best understood as the antecedent to "automatically"—the initiating human action that sets off a self-regulating sequence of events. *See United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992) ("'by a single function of the trigger' describes the action that enables the weapon to 'shoot . . . automatically . . . without manual reloading,' not the trigger mechanism."). The statute does not suggest that human involvement is confined to the "predetermined point" of the operation. Instead, "rather than reading the phrase 'by a single function of the trigger' to mean 'by *only* a single function of the trigger,' the phrase can naturally be read to establish only the preconditions for setting off the 'automatic' mechanism, without foreclosing some further degree of manual input." *Guedes II*, 920 F.3d at 31.

In sum, under the National Firearms Act and Gun Control Act, a "single function" of the trigger is best understood as a "single pull of the trigger" and "analogous motions," while automatically is best understood to mean a "result of a self-acting or self-regulating mechanism." 83 Fed. Reg. at 66,514. Taken together, these interpretations provide the best definition of a machine gun.

17

(ii)

The best definition of machine gun settled, we turn to whether a bump stock fits within it.  In terms of how a bump stock operates, the District Court found as follows: "A bump stock replaces a semiautomatic rifle's standard stock—the part of the rifle that rests against the shooter's shoulder—and enables the shooter to achieve a faster firing rate.  To use a bump stock, the shooter must maintain forward pressure on the barrel and, at the same time, pull the trigger and maintain rearward pressure on the trigger.  Once the shooter pulls the trigger, a bump stock harnesses and directs the firearm's recoil energy, thereby forcing the firearm to shift back and forth, each time 'bumping' the shooter's stationary trigger finger.  In this way, the shooter is able to reengage the trigger without additional pulls of the trigger." *Guedes III*, 520 F. Supp. 3d at 58, J.A. 43–44.  Plaintiffs conceded that they were not challenging any of the District Court's factual findings.  *See* Appellants' Opening Br. 20 ("there is no confusion or dispute whatsoever regarding *how* a bump stock physically works"); Oral Arg. Tr. at 83–84 (answering "no" to the question of whether Appellants contended that the "District Court erroneously found a fact to be undisputed that was actually disputed").  Based on these facts, a bump stock is a machine gun under the best interpretation of the statute.

It bears noting that these factual findings correspond with the Bureau's statement of undisputed facts submitted in support of a motion for summary judgment, which cited evidence in the record in support of each statement.  *See* Dkt. 61-3 ¶¶ 70–73 ("[u]sing a bump stock as designed and intended, a shooter does not need to pull the trigger more than once to produce more than one shot").  Plaintiffs did not properly dispute these facts, because their opposition failed to cite any evidence, as required by the federal and local rules.  *See* Dkt. 63-1 ¶¶ 70–

73; Fed. R. Civ. P. 56(c)(1)(A); Local Rule 7(h)(1).[5] "While the local rules provide the mechanics, the Federal Rules of Civil Procedure explicitly require a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record." *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020). *See also Bush v. D.C.*, 595 F.3d 384, 387 (D.C. Cir 2010); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150–51 (D.C. Cir. 1996).

Analyzing the District Court's factual findings under the Bump Stock Rule, we conclude that they are consistent with the best interpretation of the statute. First, as the District Court explained, a shooter operates a bump stock by a single pull, eliminating the need for additional pulls. *Guedes III*, 520 F. Supp. 3d at 58, J.A. 44. The shooter pulls the trigger once and his finger rests against the extension ledge, or the edge of the bump stock device. *See* J.A. 35.[6] After the first pull of the trigger, the stock moves repeatedly back-and-forth, causing the trigger to "bump" against the stationary finger. Thus, only a single "function" or "pull" of the trigger by the shooter activates the multiple-shot sequence; no further pulls are needed. Put differently, using a bump stock, a single pull of the trigger propels the trigger against the stationary finger and

---

[5] For example, in response to the Bureau's description of the trigger pull initiating a firing sequence, Plaintiffs responded, "In dispute as to the phrasing of multiple portions of the statement; which are attempts to draw legal conclusions, not accurately describe facts." Dkt. 63-1 ¶ 71.

[6] Plaintiffs entered a video into the record demonstrating how a bump stock operates. J.A. 35 (citing Patton Media & Consulting, LLC, *Bump Stock Analytical Video FPC/FICG*, YOUTUBE (June 14, 2018), https://youtu.be/1OyK2RdO63U). The attached appendix includes still photographs taken from that video, depicting the function of the trigger.

causes the subsequent shots through the force of recoil from firing the first bullet. Following the initial pull of the trigger, if nothing changes (i.e., the shooter maintains forward pressure on the barrel), the firearm will continue to fire additional shots continuously. As found by the District Court, the shooter is "able to reengage the trigger without additional pulls of the trigger." 520 F. Supp. 3d at 58, J.A. 44.

Second, a bump stock functions automatically because it is self-regulating. The bump stock "harnesses and directs the firearm's recoil energy" along a linear path, "thereby forcing the firearm to shift back and forth." *Guedes III*, 520 F. Supp. 3d at 58, J.A. 43–44. That process will not conclude until the shooter releases forward pressure on the barrel, the weapon runs out of ammunition, or it malfunctions. In other words, a bump stock regulates the weapon's back-and-forth movement after a predetermined point in an operation—the shooter's pull of the trigger—and remains self-regulating as long as the shooter maintains pressure on the barrel.

Looking to the specific bump stock devices at issue, even the manufacturer's description admits of this interpretation of "automatic." Plaintiff Damien Guedes purchased his bump stock device from Bump Fire Systems, while Plaintiff Shane Roden purchased a Slide Fire bump stock device. *See* Am. Compl. at 19–20, *Guedes I* (No.18-cv-02988). In an explanation of firing with a bump stock, the manufacturer Bump Fire Systems described it as a legal method of "full-auto firing." Administrative Record 840. According to the description, the shooter operates the bump stock "by gripping the fore-end of the barrel and pulling it forward," allowing him "to recreate the feeling of automatic firing." *Id.* This description confirms what the Bureau sets forth: a bump stock enables a shooter to engage in automatic firing by pulling the trigger and maintaining pressure on the stock.

This interpretation of "automatically" also comports with how the United States Patent and Trademark Office ("USPTO") interprets the term with respect to firearms. During the rulemaking process, the Bureau observed that Slide Fire, the manufacturer of the bump stocks used in the Las Vegas shooting, "has obtained multiple patents for its designs, and has rigorously enforced the patents to prevent competitors from infringing them." 83 Fed. Reg. at 13,443; *see also* 83 Fed. Reg. at 66,538, 66,545 (discussing patents); J.A. 32, Dkt. 61-1 at 16 (discussing patent application); Dkt. 61-3 ¶ 42 (referring to patents); Administrative Record 382–90 (patent application); *id.* at 834 (referring to patents). The USPTO has classified three different Slide Fire bump stock patents as primarily within the subclass 89/140,[7] which is used for weapons that are "[c]onvertible to full automatic," meaning "[g]uns wherein the firing device is selectively operable either full-automatic or semi-automatic." Class 89 Ordnance, *Classification Resources*, USPTO, https://bit.ly/3c92Dyd.[8] The USPTO further explains that "[t]he terms 'full-automatic' or 'automatic' are applied to firing devices which effect continuous fire as long as the trigger is retracted and ammunition is supplied to the gun." *Id.* While not dispositive, it is nonetheless significant that the USPTO classifies the bump stock as a device that enables a semiautomatic weapon to

---

[7] U.S. Patent No. 8,356,542, at [52]; U.S. Patent No. 8,176,835, at [52]; U.S. Patent No. 8,127,658, at [52].

[8] In the USPTO classification system, "[s]ubclasses delineate processes, structural features, and functional features of the subject matter encompassed within the scope of a class." *Amgen Inc. v. F. Hoffman-La Roche, Ltd.*, 580 F.3d 1340, 1347 n.1 (Fed. Cir. 2009).

operate in a manner functionally equivalent to that of a fully automatic weapon.[9]

Accordingly, under the best interpretation of the statute, a bump stock is a self-regulating mechanism that allows a shooter to shoot more than one shot through a single pull of the trigger. As such, it is a machine gun under the National Firearms Act and Gun Control Act.

(iii)

Unlike the Bureau, Plaintiffs have failed to show that their "machine gun" definition is workable. *See United States v. California*, 381 U.S. 139, 165 (1965) ("we best fill our responsibility of giving content to the words which Congress employed by adopting the best and most workable definitions available"). With regard to "single function of the trigger," Plaintiffs argue for a trigger-focused, rather than a shooter-focused, interpretation. In their view, the statutory language refers to the mechanical action of the trigger itself. *See* Appellants' Opening Br. 23–24 ("'function' thus most reasonably refers to the mechanical action of the trigger" and "the function of the trigger is complete when the hammer is released, and a shot is fired"). Drawing upon the Sixth Circuit's now-overturned opinion, they contend that this phrase "necessarily refers to the *trigger* and not to the shooter or the shooter's act of pulling." Appellants' Opening Br. 23 (quoting *Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 471

---

[9] What's more, all three patents describe a key feature of the bump stock as directing the recoil force along a "constrained linear path," *see* '542 Patent col. 3, l. 23; '835 Patent col. 7, l. 51; '658 Patent col. 3, l. 49–50, which is the "self-regulating" (i.e. automatic) feature that enables the recoil of the weapon to propel the trigger repeatedly into the stationary finger, resulting in the continuous firing of the weapon. *See supra* at 19.

(6th Cir. 2021), *vacated*, 19 F.4th 890 (6th Cir. 2021) (en banc)). Thus, "[a]ny subsequent bump, pull, or other interaction between the shooter's finger and the trigger . . . causes a second or subsequent function of the trigger, not a continuation of the initial completed function." *Id.* at 24. Because a semiautomatic gun outfitted with a bump stock releases the hammer for each discharge, they assert that it does not fire more than one round via a single function of the trigger.

Yet, when asked at oral argument whether a hypothetical invention—a mechanical hand with a fast, continuously moving trigger finger that could be attached to a semiautomatic gun and operated by a push of a button—qualified as a machine gun, Plaintiffs answered in the affirmative. Oral Arg. Tr. at 81–83; *see also id.* at 56 for earlier discussion. According to Plaintiffs, we could redefine the trigger in this scenario to the button being pressed, rather than the internal trigger mechanism. But this reasoning diverges from Plaintiffs' definition of "single function of the trigger" as a mechanistic act of the conventional firearm trigger itself. There are no two ways about it: either the trigger is the lever that releases the hammer and discharges a bullet, or it is not. J.A. 71. Such a concession shows that Plaintiffs' definition is unworkable, internally inconsistent, and counterintuitive.

By contrast, the Bump Stock Rule's definition would encompass this mechanical hand device. In response to comments about different trigger activation methods, the Bureau added the phrase "and analogous motions" to the final rule, thereby including devices that function via "a push or other method of initiating the firing cycle." 83 Fed. Reg. at 66,534–35. In this scenario, pushing the button neatly qualifies as an "analogous motion."

Even assuming, moreover, that it were appropriate to reconceive of the trigger on the firearm with the mechanical hand device to be the button that activates the mechanical hand's trigger finger, imagine another type of firearm that contains no such button but only a standard trigger, and that operates such that the shooter's pull of the trigger causes an internal motor to initiate a repeated movement of the trigger back and forth—with a release of the hammer each time—producing a continuous, automatic series of shots. Suppose that the weapon's trigger would automatically move back and forth after the shooter's initial pull of the trigger until the ammunition is spent, even if the shooter removes his trigger finger from the weapon during the firing sequence. Indeed, suppose that the shooter can *stop* the automatic firing sequence, should he so choose, by placing his trigger finger back on the weapon and contacting the automatically moving trigger.

Under Plaintiffs' strict understanding of the "single function of the trigger" to mean the mechanistic movement of the trigger itself, this weapon would evade classification as a machine gun even though the shooter's initial pull of the trigger causes an automatic series of trigger movements and a resulting automatic series of shots, without any further input by the shooter. The weapon is similar to the Akins Accelerator, *see* 83 Fed. Reg. at 66,517, except that the hypothetical weapon involves an internal motor that causes the trigger to automatically move back and forth after the initial pull, as opposed to an internal spring that causes the barrel to automatically move back and forth into a stationary trigger finger after the initial pull: in either case, the trigger continues to move, and shots continue to fire, without any additional input from the shooter.

Plaintiffs believe that the Akins Accelerator was mistakenly dubbed a machine gun because it, like a bump stock

device, fires only one round with each mechanical movement of the trigger. *See* Appellants' Opening Br. 8 n.2. The same is true of the hypothetical weapon described here. And insofar as Plaintiffs might nonetheless attempt to draw a distinction between the two, it is hard to see how one would involve a "single function of the trigger" and the other would not: with both, the shooter's initial pull of the trigger initiates an automatic sequence (caused by an internal motor, on one hand, and an internal spring, on the other) whereby the weapon's trigger then continuously moves back and forth, causing additional shots to fire, without any further input by the shooter. And with both, that automatic sequence continues until ammunition is exhausted; the weapon malfunctions; or the shooter takes a new action to stop that sequence. In sum, Plaintiffs' proffered interpretation of "single function of the trigger" is unsound.

Plaintiffs' interpretation of "automatically" is no less problematic. They interpret "automatically" as "self-acting" or requiring only "the expressly specified initiating action" before operating on its own. Appellants' Opening Br. 27–28. In their view, bump stocks do not operate automatically because the shooter must maintain constant forward pressure on the bump stock with his non-trigger hand to continue firing. This definition would remove what Plaintiffs would describe as a prototypical machine gun from the realm of "automatic," as the shooter must both pull the trigger and keep his finger depressed on the trigger to continue firing. Once the force is removed from the trigger, firing ceases. Per Plaintiffs' definition, only a gun that required no human input to fire more than a single shot would qualify as a machine gun. By this logic, we would no longer characterize even the prototypical machine gun as a "machine gun," given the extent of rearward pressure on the trigger required to operate it. That cannot be right.

Plaintiffs also point to Congress's decision to remove "or semiautomatically" from the definition of machine gun in the 1968 Gun Control Act as evidence that "automatically" must be interpreted narrowly in their favor. Appellants' Opening Br. 30–32. According to Plaintiffs, the significance of this erasure is linked to the Treasury Department's 1955 ruling that crank-operated Gatling guns were not machine guns. *See* Revenue Ruling 55-528, 1955 WL 9410, at *1 (Jan. 1, 1955). Taken together, Plaintiffs argue that Congress indicated its approval of this ruling by removing "or semiautomatically" from the statute, thus advancing a narrow interpretation of the statute. Yet, Plaintiffs have not offered any evidence of the link between the 1955 ruling and Congress's 1968 definition amendment. Moreover, the exclusion of semiautomatic weapons from the Gun Control Act is not implicated here; we are concerned only with the conversion of semiautomatic weapons to fully automatic firearms.

Finally, Plaintiffs' fear that all semiautomatic weapons will be subject to regulation because they can be modified with everyday items, like belt loops, to fire automatically is unfounded. Unlike a bump stock, a rubber band or belt loop is not automatic because it is not self-regulating. Rather than harnessing the firearm's recoil energy from a rubber band or belt loop in a linear path to engage in a continuous firing sequence, the shooter must harness and direct the recoil energy himself. *Bump Stock Rule*, 83 Fed. Reg. at 66,533. As the Bureau explained, "the belt loop or similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils." *Id.* Harnessing the recoil energy without an automatic device requires a great deal of skill and renders it exponentially more difficult to bump fire. These everyday devices are "objectively different" from bump stocks and do not qualify as machine guns under the Bureau's interpretation. *Id.*

26

IV.

Plaintiffs also urge us to apply the rule of lenity. The rule of lenity instructs courts to resolve ambiguity in favor of a criminal defendant, but it "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute that the Court must simply guess at what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013). *See also Staples*, 511 U.S. at 619 n.17 (applying rule of lenity was unnecessary where meaning could be derived through interpretive tools).

It is only where the Court has exhausted "everything from which aid can be derived" that lenity plays a role. *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (internal quotation marks and citations omitted). For example, in *United States v. Bass*, the Court applied the rule of lenity where it could not decisively interpret the prosecution's evidentiary burden from Title VII of the Omnibus Crime Control and Safe Streets Act of 1968. 404 U.S. 336, 337–38, 347. Given the lack of clear statutory language, legislative history, and a clear statement of congressional purpose, the Court resorted to lenity to approve a narrower construction in this instance. *Id.* at 347–50. *See also United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952) (turning to lenity in Fair Labor Standards Act case where "literal reading" of text did not illuminate statutory construction). Fortunately, we are not left to "guess at" the meaning of the text at issue here, *see Maracich*, 570 U.S. at 76, given the array of tools at our disposal, including the statute's plain language, prior case law, contemporaneous understandings, and congressional purpose. As a result, we are not left with the type of "grievous ambiguity," *see id.*, that would require the rule of lenity's application here.

To be sure, the Bureau's interpretation is not the only possible interpretation of the statute. But most importantly, the task before us is to find the best interpretation of the statute, which does not mean that it is the only "permissible" or reasonable interpretation. *See Edelman*, 535 U.S. at 114 & n.8 (internal quotation marks omitted). Further, the predominant concern among those skeptical of upholding the Bureau's interpretation is their view that it is inappropriate to use the *Chevron* framework to uphold the regulation, which is not at issue here. *See Guedes v. ATF*, 140 S. Ct. 789, 789–91 (2020) (Mem.) (Gorsuch, J., concurring in denial of certiorari) (questioning application of *Chevron* deference to the rule before us); *Gun Owners of America, Inc. v. Garland*, 19 F. 4th 890, 925 (6th Cir. 2021) (Murphy, J., dissenting) (critiquing circuit courts for failing to interpret statute before turning to *Chevron*); *Aposhian v. Wilkinson*, 989 F.3d 890, 894–96 (2021) (Mem.) (Tymkovich, J., dissenting) (same). And it is worth noting that every circuit to have considered this question has so far upheld the Bump Stock Rule. *See Cargill v. Garland*, 20 F.4th 1004 (5th Cir. 2021), *vacated and en banc granted*, -- F.4th -- (2022); *Gun Owners v. Garland*, 19 F.4th 890 (6th Cir. 2021) (en banc); *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020), *en banc granted but previous order reinstated*, 989 F.3d 890 (Mem.).

The manufacturer of one of the bump stock devices owned by Plaintiffs once promoted that its product enabled "Spraying 900 rounds in 60 seconds." *What is Bump Fire*, BUMP FIRE SYS., https://bit.ly/3PdRTNH. We join those circuits in concluding that these devices, which enable such prodigious rapid-fire capability upon a pull of the trigger, fall within the definition of "machine gun" in the National Firearms Act and Gun Control Act. For the foregoing reasons, the District Court's judgment is affirmed.

28

*So ordered.*

## **APPENDIX**



**Figure 1**: The shooter pushes the firing unit so that it slides forward inside the bump stock and he pulls the trigger.



**Figure 2**: After the first shot, the shooter's finger rests against the extension ledge of the bump stock, which "constrains" the recoil and the opposing forward force so that the firing unit slides in a linear direction, propelling the firing unit against the stationary finger, causing the firing cycle to repeat.